# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| **CNG FINANCIAL CORPORATION**<br>7755 Kenwood Road. Suite 400<br>Cincinnati, Ohio 45236<br><br>**AXCESS FINANCIAL SERVICES, INC.**<br>7755 Montgomery Road<br>Suite 400<br>Cincinnati, OH 45236<br><br>       **Plaintiffs**<br><br>v.<br><br>**ROBERT BRICHLER**<br>3839 Germania Street<br>Cincinnati, OH 45227<br><br>       **Defendant.** | CASE NO. |

## VERIFIED COMPLAINT FOR A PRELIMINARY INJUNCTION, PERMANENT INJUNCTION, AND OTHER RELIEF

Plaintiffs CNG Financial Corporation ("CNG") and Axcess Financial Services, Inc. ("Axcess") (collectively, "Plaintiffs") hereby file their Verified Complaint for a Preliminary Injunction, Permanent Injunction, and Other Relief against Defendant Robert Brichler ("Defendant") and state as follows:

### NATURE OF THE CASE

1. Plaintiffs bring this action for injunctive relief and damages arising out of its former Chief Technology Officer's brazen violation of restrictive covenants he agreed to with Plaintiffs in exchange for generous compensation and benefits opportunities. Plaintiffs seek an order enjoining its former executive, who both created and had intimate access to Plaintiffs'

highest confidential, proprietary and trade secret information, from unlawfully competing with Plaintiff and misappropriating Plaintiffs' trade secret and confidential information in direct violation of his contractual and statutory obligations to Plaintiffs.

## PARTIES, JURISDICTION AND VENUE

2. Plaintiff CNG is a corporation organized and existing under the laws of the State of Ohio. Its principal place of business is Mason, Ohio. CNG owns various subsidiaries that provide financial products and services for a wide variety of consumer needs.

3. Plaintiff Axcess is a company organized and existing under the laws of the State of Ohio. Its principal place of business is Mason, Ohio. Through its brands, Axcess provides short-term loan products and loan servicing to millions of underserved consumers across the United States. . CNG is the ultimate parent company of Axcess.

4. Defendant Robert Brichler is a former executive of Plaintiffs, until very recently serving as CTO of Axcess. He is a citizen of Ohio who, upon information and belief, currently resides at 3839 Germania Street, Cincinnati, Ohio 45227.

5. Jurisdiction is conferred pursuant to the 28 U.S.C. § 1331, as this action arises under the laws of the United States, specifically, under 18 U.S.C. § 1836 *et seq*., the federal Defend Trade Secrets Act of 2016 ("DTSA"). The remaining claims are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as the claim under the DTSA.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), as Defendant resides in this district, and 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

7. This Court has personal jurisdiction over Defendant, including because he expressly agreed that "[a]ny dispute among the parties related to compliance with or the breach of any term of [the Non-Compete Agreement] shall be exclusively litigated in a state or federal court of competent jurisdiction in Hamilton County, Ohio," and that he "consent[s] to venue and personal jurisdiction in such forum." (Ex. A, Non-Compete Agreement, ¶ 9.5)

## FACTUAL BACKGROUND

8. CNG and its subsidiary Axcess are leaders in the consumer financial services industry, providing a wide range of convenient, approachable financial products and services that improve consumers' financial situations by meeting their lifestyle and budgetary needs. Axcess provides on-line and in-person payday and installment loan products through its brands Check 'n Go and Allied Cash Advance. Allied Cash Advance, in particular, has developed a proprietary on-line application process that matches consumers with prospective online lender(s) participating in Allied Cash Advance's network of online lender(s).

9. Lendly, LLC ("Lendly"), newer to the short-term personal installment loan industry, like Axcess is not a direct lender but similarly connects online users with access to direct lenders for short-term personal loans. Lendly utilizes an internet-based platform on which users fill out an on-line personal loan application, which is then shared with a network of lenders who contract directly with the consumer.

10. Plaintiffs' confidential, proprietary and trade secret information is critical to maintaining a competitive position in the consumer financial services industry, and accordingly, Plaintiffs take a number of steps to protect the confidentiality of their information, including: (a) requiring employees to execute nondisclosure, non-compete and non-solicitation agreements; (b) maintaining and promulgating policies relating to information security, systems access and

3

device use; (c) implementing electronic security measures, such as use of passwords; and (d) employing physical security measures, such as placing locks on offices, doors and file cabinets.

### DEFENDANT'S EMPLOYMENT WITH PLAINTIFFS AND CREATION OF AND ACCESS TO PLAINITFF'S CONFIDENTIAL, PROPRIETARY AND TRADE SECRET INFORMATION

11. Defendant began employment with Axcess as its Vice President, Software Engineering in or around May 2016. In February 2020, Axcess promoted Defendant to the position of Chief Technology Officer.

12. As a condition of his employment with Axcess, Defendant signed an Employee Confidentiality, Noncompetition, Nonsolicitation Agreement on or about March 27, 2017. As a condition of his continued employment with Axcess and in exchange for the ability to participate in several executive incentive plans, on or about February 2, 2021, Defendant executed a second Employee Confidentiality, Noncompetition, Nonsolicitation Agreement (the "Non-Compete Agreement"). A true and correct copy of the Non-Compete Agreement is attached hereto as **Exhibit A**.

13. Pursuant to the Non-Compete Agreement, Defendant agreed to refrain from competing against Plaintiffs for a period of twelve months following the termination of his employment for any reason. *See* Ex. A, Non-Compete Agreement, at ¶¶ 3.1–3.1.1.

14. Specifically, the Non-Compete Agreement contains the following limited non-competition restrictions:

> ***During Employee's employment and for a period of twelve (12) months following Employee's termination of employment for any reason*** (collectively, the "Restricted Period"), ***Employee will not compete against or engage in activities in preparation for competing against the Company.*** Employee will be deemed to be competing with the Company if he/she is ... employed by ... any person or entity that competes with the Company or that may reasonably be construed to compete with the Company, including but not limited to any company that engages in the

4

>business of deferred presentment services, ***subprime short term and/or unsecured lending services,*** company that engages in subprime title loans and check cashing, ***no credit required leasing or rent to own,*** or any other business in which the Company engages, or in which the Company is actively considering and planning to invest or participate.

(Ex. A, Non-Compete Agreement, at ¶¶ 3.1–3.1.1) (emphasis added).

15. Defendant also agreed not to "use, divulge, disclose, reveal, or communicate, other than as required in the performance of [his] duties for [Axcess], any Confidential Information [of Plaintiffs'] for so long as such Confidential Information is not publicly available[.]" (Ex. A, Non-Compete Agreement, at ¶¶ 1.1–1.2).

16. During his tenure with Axcess, Defendant gained an in-depth understanding of Plaintiffs' processes, procedures, materials, intellectual property and platforms.

17. Most recently in his role as Chief Technology Officer, Defendant was responsible for overseeing Axcess' technology-related functions, including, among other things, planning and implementing strategies related to enterprise infrastructure, technology architecture, data management and IT governance. Defendant also managed a team of six employees engaged in software engineering, enterprise architecture, and database management.

18. As Chief Technology Officer, Defendant routinely participated in executive-level meetings and planning sessions with various business teams throughout the organization and reported to Plaintiffs' Board of Directors on matters related to technology, data security and data privacy.

19. As Chief Technology Officer, Defendant participated in Executive Leadership Team meetings where confidential strategic matters were discussed and at which key strategic decisions were made. Defendant served as the decision-maker for matters related to Plaintiffs'

5

technology during Executive Leadership Team meetings and otherwise over the course of his employment.

20. As Chief Technology Officer, Defendant served as a member of Plaintiffs' compliance committee, through which he received exceptionally sensitive and confidential internal communications relating to Plaintiffs' business.

21. As Chief Technology Officer, Defendant served as a member of Plaintiffs' credit committee, through which Defendant participated in planning, strategy, discussion and development of Plaintiffs' bank loan servicing program, one of Plaintiffs' signature product offerings.

22. As Chief Technology Officer, Defendant attended off-site strategic sessions with key stakeholders and decision-makers where goals, ideas, platforms and significant intellectual property matters relating to Plaintiffs' business were discussed.

23. Given his status as a trusted executive, Defendant had knowledge of, access to, and in fact created, some of Plaintiffs' most sensitive and valuable confidential and trade secret information, including, but not limited to, Plaintiffs' detailed business plans and strategies, processes, methods, software, technology, intellectual property and platforms (the "Proprietary Information").

24. In particular, Defendant built software and systems to support Plaintiffs' key products and services. By way of example, Defendant built Plaintiffs' online loan application platform at the core of Plaintiffs' bank partnership program, including building the code for the platform and enhancements, and integrating underwriting, fraud and other compliance check processes for the consumer-facing tools associated with the program.

25. Defendant also managed Plaintiffs' cloud infrastructure and platform migration, and selected key strategic partners to provide technology and business services. Defendant was also charged with ensuring Axcess' IT platforms continued to reliably serve critical business functionality such as processing millions of loan applications.

26. At the time of his departure, Defendant was responsible for guiding the implementation and launch of major business initiatives, such as "Xact expansion," a technology update on the installment bank loan product serviced by Axcess, which functions very similarly to the bank loan product offered by Lendly.

27. Defendant was responsible for evaluating, designing, and implementing Plaintiffs' use of specialized loan management, servicing and collections software offered by a third-party vendor, LoanPro. Over a period of approximately one year, Defendant oversaw the process of identifying, designing custom middleware for, and applying the optimal configurations to integrate LoanPro's software into Plaintiffs' platforms and services. Upon information and belief, Lendly has contracted with LoanPro to use the same software to support its competitive products, but has not yet implemented or configured its use.

28. Defendant was also responsible for designing and implementing Plaintiffs' integration to a third-party lead buy and origination platform and service with the LoanPro servicing system. From March 2021 through the time of his resignation, Defendant was the main point of contact for all design elements of the solution, which is a novel implementation of the third-party's platform and provides Plaintiffs with a competitive market advantage.

29. Defendant was responsible for evaluating, selecting and implementing Plaintiffs' use of a credit decisioning engine offered by a third-party vendor, GDS. Over a period of approximately four years, Defendant oversaw the process of designing, implementing, and

7

continuously maintaining the system to integrate Plaintiffs' proprietary loan origination platforms and services. Upon information and belief, Lendly has contracted with GDS to use the same software to support its competitive products, but has not yet implemented or configured its use.

30. Defendant also oversaw the design, development and implementation of Plaintiffs' proprietary underwriting engine, which integrates fraud, creditworthiness and other compliance checks with installment bank loan products Axcess services. The proprietary underwriting engine eliminates Plaintiffs' need to rely on third parties like GDS to provide similar functionality, resulting in significant cost savings and a competitive market advantage.

31. By virtue of his role as Chief Technology Officer, Defendant was uniquely positioned to both access and develop Plaintiffs' strategic plans and to build the technological tools to implement them. At the time of his abrupt resignation, Defendant possessed unparalleled knowledge of the systems, processes, software, platforms and intellectual property underlying Plaintiffs' products and services.

32. Defendant's exceptionally intimate knowledge of Plaintiffs' business, strategies and technology, and other confidential, proprietary and trade secret information would, if disclosed, provide Plaintiffs' competitors with an unfair competitive advantage.

**DEFENDANT RESIGNS TO JOIN A DIRECT COMPETITOR**

33. Lendly competes directly with Plaintiffs. According to its website, Lendly was created "with the intent to provide consumers a loan with non-traditional underwriting methods and a convenient and affordable repayment structure." *See* Lendly website, available at https://getlendly.com/#ourMission, last accessed July 8, 2021).

8

34. Like Axcess, Lendly services subprime short term or unsecured personal loans through third-party banking partners using an internet-based platform. Lendly's consumer loan servicing products are nearly identical to certain servicing products offered by Axcess, and the two companies directly compete for the same customers.

35. Indeed, in connection with their competing bank installment loan servicing products, Axcess and Lendly both have a business relationship with the same lending partner, and both have contracted with the same third-party vendors to provide business and technology services.

36. On June 11, 2021, Defendant informed Plaintiffs that he had been offered the role of Chief Technology Officer with Lendly. Plaintiffs reminded Defendant of his non-compete obligations that same day.

37. On June 14, 2021, Plaintiffs met with Defendant and again reminded him of his non-compete obligations. Plaintiffs additionally confirmed that they considered Lendly to be a direct competitor.

38. On June 15, 2021, Plaintiffs again met with Defendant and informed him that they would seek to enforce the Non-Compete Agreement if Defendant accepted employment with Lendly. During that meeting, Defendant verbally resigned his employment with Axcess, and later that day, submitted written notice of his resignation via email.

**PLAINTIFFS' EFFORTS TO CURB DEFENDANT'S UNLAWFUL CONDUCT**

39. On June 15, 2021, the day Defendant provided notice of his resignation from his employment with Axcess, Plaintiffs provided written notice to Lendly of Defendant's non-compete obligations and Axcess' intent to enforce such obligations. Plaintiffs also informed Lendly that Defendant's employment with Lendly would violate his Non-Compete Agreement

9

and requested certain assurances from Lendly.  A true and correct copy of Axcess' June 15, 2021 letter to Lendly is attached as **Exhibit B**.

40. On June 18, 2021, Plaintiffs provided Defendant with written notice of his legal obligations under the Non-Compete Agreement, as well as Plaintiffs' intent to enforce such obligations.  The notice informed Defendant that he would be in violation of his continuing obligations to Plaintiffs if he accepted employment with Lendly, and requested assurances of compliance from Defendant.  A true and correct copy of Axcess' June 18, 2021 letter to Defendant is attached as **Exhibit C**.

41. Neither Lendly nor Defendant provided Plaintiffs with adequate assurances of compliance with their respective legal obligations.

## DEFENDANT'S EMPLOYMENT WITH LENDLY

42. Shortly after Defendant's resignation, Plaintiffs learned that Defendant had accepted employment with Lendly as its Chief Technology Officer, *the same position he held with Axcess*, and upon information and belief, Defendant has begun working for Lendly in that capacity.

43. By accepting employment with Lendly, Defendant has violated the terms set forth in Paragraphs 3.1 and 3.1.1 of the Non-Compete Agreement by working for a direct competitor within the 12-month restricted period prescribed by the Non-Compete Agreement.

44. Defendant's current role with Lendly is virtually identical to the role he held with Axcess.  Upon information and belief, in his role as Lendly's Chief Technology Officer, Defendant will perform the same or substantially similar duties to those he performed for Axcess, including, but not limited to, building out software and systems to support Lendly's

consumer products using the same methods and processes underlying Plaintiffs' product offerings.

45. Upon information and belief, as Lendly's Chief Technology Officer, Defendant will also be responsible for overseeing Lendly's technology-related functions; managing Lendly's cloud infrastructure and platforms; devising Lendly's technology and other strategies; and managing Lendly's technology team, all of which were core responsibilities Defendant carried out while employed by Axcess.

46. As a result of Defendant's substantial knowledge of and access to Plaintiffs' confidential, proprietary and trade secret information, as well as Defendant's performance of substantially similar duties for Lendly as those he performed for Axcess, Defendant has disclosed or used or inevitably will disclose or use Plaintiffs' trade secrets in the course of his employment with Lendly, a direct competitor.

47. It will be impossible for Defendant to avoid using his knowledge of Plaintiffs' trade secrets and other confidential information while working as Lendly's Chief Technology Officer.

48. Defendant's use and disclosure of Plaintiffs' trade secrets has provided or will provide Lendly with an unfair competitive advantage and deprive Plaintiffs of the benefit of their investment in key personnel and resources to develop market-leading products and services.

49. Defendant's actions have caused and will continue to cause Plaintiffs to suffer immediate and irreparable injury, loss and damage.

## COUNT I
## Breach of Contract

50. Plaintiffs incorporate all preceding paragraphs of the Complaint as if fully set forth herein.

51. The Non-Compete Agreement constitutes a valid and enforceable contract.

52. Defendant's actions, as set forth herein, constitute a breach of the Non-Compete Agreement.

53. Specifically, Defendant's acceptance of employment with a direct competitor violates the non-competition obligations set forth in the Non-Compete Agreement. Defendant agreed that he would not, for a period of twelve months following termination of his employment with Axcess, be employed by, work for, or become associated with any entity that competes with Plaintiffs, including any entity that engages in subprime short term and/or unsecured lending services.

54. Lendly directly competes with Plaintiffs, engages is subprime short term lending services, and constitutes an "entity that competes" with Plaintiffs as defined in the Non-Compete Agreement. Defendant's acceptance of employment with, and performance of work for, Lendly violates the Non-Compete Agreement.

55. Plaintiffs performed under the Non-Compete Agreement and satisfied all relevant obligations thereunder.

56. Defendant has violated and will continue to violate the Non-Compete Agreement by working for, being employed by, and/or being associated with an entity that competes with Plaintiffs.

57. Plaintiffs have a legitimate interest in protecting their investment in developing software, source code, systems, platforms, infrastructures, architectures, current and future

products, and business strategies by preventing Defendant from violating the Non-Compete Agreement to Plaintiffs' detriment.

58. The applicable restraints in the Non-Compete Agreement were and are reasonably necessary to protect Plaintiffs' legitimate business interests and are no broader than necessary to effectuate that purpose.

59. If Defendant's wrongful conduct is permitted to continue, Plaintiffs will suffer substantial and irreparable injury to their business and their competitors will obtain an unfair advantage in the marketplace. Plaintiffs have no adequate remedy at law. Plaintiffs have also suffered direct and consequential damages, and are entitled to recover compensatory damages, attorneys' fees pursuant to the Non-Compete Agreement, and other damages in an amount to be proven at trial.

60. Plaintiffs are entitled to injunctive relief enjoining Defendant, his agents, and all persons acting in concert or participation with him, from unlawfully competing with Plaintiffs' to Plaintiffs' detriment during the 12-month restricted period set forth in the Non-Compete Agreement.

## COUNT II
### Violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. §1836

61. Plaintiffs incorporate all preceding paragraphs of the Complaint as if fully set forth herein.

62. As a result of his employment and position of trust with Plaintiffs, Defendant was provided access to Plaintiffs' trade secret information, including but not limited to, the Proprietary Information.

63. The Proprietary Information is used in connection with Plaintiffs' products and services that are offered and sold across the country.

64. Plaintiffs have undertaken reasonable measures to safeguard their trade secret information.

65. The Proprietary Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

66. Defendant was subject to a non-disclosure agreement that required that he maintain the confidentiality of the Proprietary Information, and prohibited him from using such information other than as necessary in the course of performing his duties for Plaintiffs and as authorized by Plaintiffs.

67. Upon information and belief, Defendant has used and/or disclosed, or inevitably will use and/or disclose, Plaintiffs' trade secret information, including the Proprietary Information, for Defendant and Lendly's benefit and advantage.

68. Defendant's conduct constitutes knowing, willful and malicious misappropriation.

69. As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have been substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, Defendant will cause further irreparable injury to Plaintiffs. Plaintiffs have also suffered direct and consequential damages, and are entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

### COUNT III
### Violation of the Ohio Uniform Trade Secrets Act, O.R.C. § 1333.61 *et seq.*

70. Plaintiffs incorporate all preceding paragraphs of the Complaint as if fully set forth herein.

71. Plaintiffs entrusted Defendant with their confidential, proprietary and trade secret information, including the Proprietary Information.

72. Plaintiffs have taken reasonable measures to maintain the secrecy of their trade secret information, including the Proprietary Information. The Proprietary Information derives independent economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure.

73. Plaintiffs have undertaken reasonable measures to safeguard their trade secret information.

74. Defendant has misappropriated, or his conduct constitutes a substantial threat that he will misappropriate, Plaintiff's trade secret information, including the Proprietary Information, by disclosing and/or using it to Defendant's and Lendly's advantage, including through inevitable disclosure as a result of Defendant's employment with Lendly.

75. Defendant's conduct constitutes knowing, willful and malicious misappropriation.

76. As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have been substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, Defendant will cause further irreparable injury to Plaintiffs. Plaintiffs have also suffered direct and consequential damages, and are entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs CNG and Axcess pray as follows:

(a) That the Court award Plaintiffs preliminary injunctive relief in the form of specifically enforcing Defendant's Non-Compete Agreement, including the 12-month post-

employment non-competition covenant set forth therein, and including any necessary tolling for periods of violation;

(b) That Defendant be enjoined from using, divulging, disclosing, revealing, or communicating Plaintiffs' Confidential Information, as defined in the Non-Compete Agreement.

(c) That Defendant be enjoined from actual or threatened misappropriation of Plaintiffs' trade secrets;

(d) That Plaintiffs be awarded damages for any loss occasioned by breaches of contract and the misappropriation of trade secrets;

(e) That Plaintiffs be awarded punitive or exemplary damages for Defendant's willful and malicious misappropriation of trade secrets;

(f) That Plaintiffs be awarded attorneys' fees for the Defendant's willful and malicious misappropriation of trade secrets; and

(g) That Plaintiffs be granted its costs of suit together with reasonable attorneys' fees pursuant to the Non-Compete Agreement, along with such other and further relief as the Court deems appropriate.

Respectfully submitted,

*/s/ Jill Kirila*
Jill S. Kirila (0068593) (Trial Attorney)
**SQUIRE PATTON BOGGS (US) LLP**
201 East Fourth Street, Suite 1900
Cincinnati, Ohio 45202
(513) 361-1200
(513) 361-1201 (facsimile)
jill.kirila@squirepb.com

Attorneys for Plaintiffs

## VERIFICATION

I am the Chief Information Officer of Plaintiff CNG Holdings, Inc., and I am authorized to make this verification on behalf of Plaintiffs CNG Holdings, Inc. and Axcess Financial Services, Inc. I have read the foregoing Verified Complaint, I am familiar with the matters and things alleged therein, and to the best of my knowledge and belief, the facts stated and the allegations contained therein are true.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of July, 2021.

_____
Chris Sibila