## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| CNG FINANCIAL CORP., *et al.*, | : | Case No. 1:21-cv-460 |
| | : | |
| Plaintiffs, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| ROBERT BRICHLER, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER DENYING PLAINTIFF'S MOTION FOR
## PRELIMINARY INJUNCTION (Doc. 2)

This civil case is before the Court on Plaintiffs CNG Financial Corporation and

Axcess's motion for preliminary injunction (Doc. 2), and the parties' responsive

memoranda (Docs. 14, 23).[1] Also before the Court is Defendant's motion for leave to file

a sur-reply (Doc. 25). and the parties' responsive memoranda (Docs. 26, 31).

## I.  BACKGROUND

The Court will briefly summarize Plaintiffs' allegations, and then will relate the

parties' evidence presented in support of and in opposition to Plaintiffs' motion for a

preliminary injunction.  (Doc. 2).

---

[1] The Court finds that an evidentiary hearing is unnecessary.  "[Sixth Circuit] Rule 65 jurisprudence indicates that a hearing is only required when there are disputed factual issues, and not when the issues are primarily questions of law."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007).  Here, the issues presented, particularly the reasonableness of the non-compete agreement under Ohio law, and whether certain information is a trade secret, are primarily questions of law, not fact.

Defendant Robert Brichler is a former employee of Plaintiff Axcess. (Doc. 2). Axcess's parent company, CNG Financial, is also a Plaintiff.[2] *Id.* Plaintiff corporations are in the "consumer financial services industry, including consumer loan products and servicing." (*Id.* at 3-4). Brichler served as a Vice President of software for about four years and then, for over one year, as the Chief Technology Officer ("CTO"). (*Id.*). As CTO, Brichler had responsibility for "planning and implementing strategies related to enterprise infrastructure, technology architecture, data management and IT governance." (*Id.*). He also had alleged insight into business plans and strategies through his high-ranking position and participation in certain leadership committees. (*Id.* at 5-6).

Brichler executed a series of Non-Compete agreements with Axcess. (*Id.* at 8). He signed one in 2017 upon joining the company and another as a pre-condition to his promotion to CTO in 2021. (*Id.*). The 2021 Non-Compete Agreement ("Non-Compete") has a duration of 12 months and no geographical limitation. (*Id.*). The Non-Compete also contains non-disclosure restrictions for non-public confidential information. It defines confidential information, in part, as "plans, technology, processes, techniques, methods of operation, technical data, software and documentation thereof." (*Id.* at 9).

Four months after signing the 2021 Non-Compete, Brichler left Axcess to become CTO at a corporation called Lendly. (*Id.* at 9). Lendly "services subprime short term or unsecured personal loans through third-party banking partners…." (*Id.*). Both Axcess and

---

[2] Hereafter, the Court will refer singularly to "Axcess" to represent both Plaintiff corporations unless otherwise stated.

Lendly "have contracted with the same third-party vendors to provide business and technology services related to those products." (*Id.* at 10).

After hearing of Brichler's new role with an alleged competitor, Axcess provided a written notice on Brichler and Lendly of his contractual obligations under the 2021 Non-Compete. (*Id.* at 10). Plaintiffs asked for, and did not receive, adequate assurances from Brichler and Lendly. (*Id.* at 11).

Plaintiffs request that the Court enjoin Brichler from:

1.  Violating his restrictive covenant with Plaintiffs

2.  Unlawfully competing with Plaintiffs; and

3.  Misappropriating Plaintiffs' confidential information and trade secrets. (*Id.* at 1).

## A.      Evidence as Presented by the Parties

### 1.      Axcess's Evidence

#### i.        The Non-Compete agreement

On February 2, 2021, Brichler signed the 2021 Non-Compete agreement ("Non-Compete"). (Doc. 2-1).  The Non-Compete bars employment with a competitor, with no geographic limitation, for one year after Brichler's exit from Axcess. (*Id.* at ¶1.2, PageID# 22). Specifically, the Non-Compete states:

> "Employee will be deemed to be competing with the Company if he/she is ... employed by. any person or entity that competes with the Company or that may reasonably be construed to compete with the Company, including but not limited to any company that engages in the business of deferred  presentment services, subprime short term and/or unsecured lending services, company that engages in subprime title loans and check cashing, no credit required leasing or rent to own, or any other business in which the Company engages, or in which the Company is

actively considering and planning to invest or participate in (Doc. 1-2, PageID# 22-23).

.

The Non-Compete also states Brichler shall not "use, divulge, disclose, reveal, or communicate," confidential information. (*Id.*, PageID# 21). The Non-Compete continues:

> "Confidential Information means any and all confidential and/or proprietary knowledge, data or information of the Company, its affiliated entities, customers, potential customers and suppliers, concerning any matters affecting or relating to the Company, its employees, representatives, agents and contractors, its customers and potential customers, and/or its vendors and business associates, including without limitation customer or potential customer lists, vendor or business associate lists, costs, plans, technology, processes, policies, techniques, trade practices, finances, accounting methods, methods of operations, technical data, software and documentation thereof, hardware configuration information, or other data reasonably considered by the Company or its business associates to be confidential information." (*Id.*).

Finally, the Non-Compete provides that "the Employee acknowledges that Employee's breach of [the Agreement] will cause, in addition to any monetary damage, irreparable damage to the Company for which monetary damages alone will not constitute an adequate remedy." (*Id.*, PageID# 25).

### ii. Brichler's work on technology projects

Before receiving his promotion to CTO, Brichler worked at Axcess as a Vice President of Software. Brichler "was involved in the development and implementation of Plaintiffs' lending solutions end-to-end, including the loan application and underwriting processes, and all components of the technology stack on which Plaintiffs' products and services run." (Doc. 24 at 3; Doc. 17, Rule 30(b)(6) Deposition of Plaintiffs CNG Financial Corporation and Axcess Financial Services, Inc. "Plaintiff Dep." at 29:13-24). Axcess identifies a few projects of particular relevance.

Working with a team, Brichler rolled out a third-party loan management software called LoanPro. (Plaintiff Dep. 67:11-16; Doc 23-4, Declaration of Chris Sibila,[3] "Sibila Decl." at ¶12).  LoanPro required the development of "middleware" and other integrations to make it functional with Axcess's existing systems. (Plaintiff Dep. 67-68).  According to Brichler himself, Brichler road-mapped and organized the LoanPro integration project, creating planning documents and other materials. (Doc. 18, Deposition of Robert Brichler, "Brichler Dep.," 63:11-65:12). The LoanPro integration was long, requiring "learning" and "adjusting." (*Id.*).  Axcess alleges that "the decision-making process and the resulting middleware itself is confidential and proprietary." (Doc. 24 at 8).

Brichler was involved with a similarly complex integration of another third-party platform, called GDS Link, which supports underwriting of loans and "credit-decisioning."   (Brichler Dep., 55:2-56:10; Sibila Decl. at ¶18). As with LoanPro, Brichler had to develop proprietary underwriting components to make GDS Link work within Axcess's technology infrastructure. (Brichler Dep., 55:21-56:14, 19-25).  Axcess states that "[t]he selection of components to build outside of GDS Link, how those components were set up and further developed, and the middleware required to integrate GDS Link, Axcess' proprietary underwriting components, and LoanPro together are all proprietary and confidential information belonging to Axcess." (Doc. 24 at 8).

---

[3] Sibila is the Chief Information Officer of Axcess's parent company CNG Financial. (Sibila Decl. at ¶2).

Brichler, furthermore, developed "eligibility rules" to determine eligibility of certain consumers for certain loan products. Brichler "figured out" how to "establish rules" and "run them in real time" during the application process. (Brichler Dep., 46:6-24).

Also in the area of regulatory compliance, Brichler developed processes for sending out Notices of Adverse Action ("NOAA") to consumers who were denied loans. Brichler Dep., 36:1-25. Axcess considers its "rigorous approach to and proprietary solution for regulatory compliance in this regard…industry leading." (Doc. 24 at 9); Plaintiff Dep., 82-83.

Brichler worked with a third-party to build out Axcess' identity authentication and fraud detection capacities. (Doc. 23-8, Declaration of Evan Davis,[4] "Davis Decl." at ¶14). Axcess asserts, likewise, that these capacities are "industry-leading." (*Id.*).

### iii. Brichler's access to strategic information

Brichler was also on three leadership committees, including the Executive Leadership Team ("ELT"). (Sibila Decl. at ¶7). Because of his role on ELT and his high-ranking position, he had access to high-level business strategy. (*Id.*). This included, for example, knowledge of companies Axcess was considering for partnerships or acquisitions. (Plaintiff Dep., 30:6-31:19). Brichler also had access to allegedly confidential information because of committee meetings where "strategies were discussed." (*Id.* at 32:7).

---

[4] Davis is the Senior Director, Strategic Initiatives for Axcess. (Davis Decl. at ¶2).

Axcess states Brichler "was privy to confidential and proprietary information regarding Axcess' business and operations, including with respect to Axcess' financial information, marketing strategies, growth metrics and operational information, and including business performance and current and future initiatives." (Doc. 24 at 10).

### iv. Brichler's work at Lendly

Lendly also operates in the sub-prime consumer loan space. (Brichler Dep., 93:5-11; Plaintiff Dep., 56:5-14); Rule 30(b)(6) deposition of Lendly "Lendly Dep.," 18:7-9). Brichler abruptly left Axcess to take the same title, CTO, at Lendly. (Lendly Dep., 158:13-160:23). Lendly understood it would have to "fight later" with regards to the Non-Compete—which is to say after hiring Brichler. (Doc. 23-10).

Axcess alleges Brichler's role is similar to his role at Axcess because "oversight and responsibility for all of Lendly's technology functions" belong to Brichler. (Lendly Dep., 158:13-160:23). Lendly uses both GDS Link and LoanPro. Specifically, Axcess states, Brichler has "worked closely with the data team to advance several initiatives, including extracting data from Lendly's legacy loan management system (Brichler Dep., 164:12-24), extracting loan application information from GDS (Brichler Dep., 162:1-25), extracting personally identifiable information from LoanPro (Brichler Dep., 169:4-170:6) and taking a "deep dive" into all data issues relating to Lendly's business." (Doc. 24 at 16) (citations in original).

### 2. Brichler's Evidence

### i. Work at and departure from Axcess

Brichler worked as an IT professional for six years before coming to Axcess.

(Brichler Decl. at ¶ 3). As CTO at Axcess, Brichler says he managed Axcess "IT organization" and its "technology team." (*Id.* at ¶8). The hiring of Chris Sibila as CIO effectively demoted Brichler. (*Id.* at ¶10). Brichler lost job responsibilities and earning capacity. (*Id.* at ¶15; Plaintiff Dep. at 84, 88). After Sibila was hired, Brichler lost his place on leadership committees. (Brichler Decl. at ¶15).

Brichler states he did not work on the credit decisioning software that links to GDS. Brichler states "a separate Credit Risk team built and maintained these models." (Brichler Decl. at ¶14).

A third-party recruiter reached out to Brichler on behalf of Lendly. (Brichler Decl. at ¶16). Lendly's interviewers spoke generally about the position and did ask about his experience with LoanPro and GDS Link. (*Id.* at ¶17). Brichler declares he accepted the position because it would advance his career. (*Id.* at ¶19). Brichler gave notice of his resignation and disclosed that he would take a job with Lendly. (*Id.* at ¶20). Brichler took nothing with him and acted, according to Axcess, "above board." (*Id.* at ¶¶23-24; Plaintiff Dep. at 33). Brichler says Lendly instructed him to not take customers or employees or use proprietary information. (Doc. 14-5, Declaration of Andrew Swartz[5], "Swartz Decl.," at ¶13). Brichler declares he has not revealed confidential information or trade secrets. (Brichler Decl. at ¶31). He also declares he has not taken or solicited any customers or employees of Axcess. (*Id.*).

---

[5] Swartz is the Chief Executive Officer of Lendly. (Swartz Decl. at ¶2).

### ii.   Business of Lendly and Brichler's role

Lendly services loans targeted at "subprime borrowers." (Swartz Decl. at ¶3). Brichler began his employment with Lendly on June 24, 2021. (*Id.* at ¶12). Brichler's role with Lendly will include "building and managing the IT team in general." (Brichler Decl. at ¶25). But a substantial part of Brichler's work will involve the Direct Deposit product where the borrower pays back the loan through payroll contributions. (*Id.*). Brichler declares that his employment with Lendly will only require that he use his "general skills and knowledge." (*Id.* at ¶35).

Lendly does indeed use LoanPro and GDS. (Swartz Decl. at ¶¶25,26).   However, Brichler states that Lendly implemented those products before Axcess did. (*Id.* at ¶¶28, 30). Moreover, Lendly already has an existing and "robust" technological and data infrastructure. (Swartz Decl. at ¶24). Brichler will not be involved in a proprietary engine underwriting or GDS integration at Lendly. (Brichler Decl. at ¶29). For these reasons, Brichler declares he has no need to use "confidential or trade secret information belonging to Axcess." (Brichler Decl. at ¶34). Instead, Brichler will use "general skills and knowledge" he has developed from working in the profession. (*Id.* at ¶35).

Brichler says he has not brought any proprietary tools with him, it would be impossible for him to recreate such tools, and that they would be no use to Lendly, which runs on its own software. (*Id.* at ¶38).

## II. MOTION FOR PRELIMINARY INJUNCTION

Plaintiff bears the heavy burden of demonstrating its entitlement to injunctive relief.  An "injunction is an **extraordinary remedy** which should be granted only if the

movant carries his or her burden of proving that the circumstances <u>clearly</u> demand it."

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)

(emphasis added).

      In determining whether to grant injunctive relief, this Court must weigh four

factors: (1) whether the moving party has shown a strong likelihood of success on the

merits; (2) whether the moving party will suffer irreparable harm if the injunction is not

issued; (3) whether the issuance of the injunction would cause substantial harm to others;

and (4) whether the public interest would be served by issuing the injunction. *Hall v.*

*Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526–27 (6th Cir. 2017). These four

considerations are factors that must be balanced, not prerequisites that must be met.

*McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997).

"Although no one factor is controlling, a finding that there is simply no likelihood of

success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d

620, 625 (6th Cir. 2000).

## III.  ANALYSIS

### A.  Likelihood of Success

      The first preliminary injunction factor is whether Plaintiff has established a strong

likelihood of success on the merits. To establish a strong likelihood of success on the

merits, a plaintiff "is not required to prove [its] case in full." *Univ. of Tex.*, 451 U.S. at

395. However, a plaintiff "must show more than a mere possibility of success." *Six*

*Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). In

this case, Axcess alleges two claims against Brichler: breach of contract related to the Non-Compete and misappropriation of trade secrets. The Court considers each in turn.

### 1.    Breach of Contract (Non-Compete)

Under Ohio law, to succeed on a breach of contract claim, a plaintiff must show (1) that a contract existed, (2) that the plaintiff fulfilled his contractual obligations, (3) that the defendant failed to fulfill his contractual obligations, and (4) that the plaintiff incurred damages as a result of the defendant's failure. *Langfan v. Carlton Gardens Co.*, 916 N.E.2d 1079, 1087 (Ohio Ct. App. 2009).

Seemingly because Lendly is a sub-prime personal lender, Brichler does not materially challenge that his employment with Lendly violates the Non-Compete based on its own terms. Instead, Brichler challenges the reasonableness of the Non-Compete.

In Ohio, reasonable non-compete agreements are enforced, and unreasonable non-compete agreements are enforced, to the extent necessary to protect an employer's legitimate interest. *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 275 (Ohio Ct. App. 2000). The Supreme Court of Ohio has held that "[a] covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975).

When determining the validity on a non-compete, "each case must be decided on its own facts." *Id*. Courts consider the following nine factors in assessing the reasonableness of a non-compete agreement: (1) whether the covenant imposes temporal

and spatial limitations; (2) whether the employee had contact with customers; (3) whether the employee possesses confidential information or trade secrets; (4) whether the covenant bars only unfair competition; (5) whether the covenant stifles the employee's inherent skill and experience; (6) whether the benefit to the employer is disproportionate to the employee's detriment; (7) whether the covenant destroys the employee's sole means of support; (8) whether the employee's talent was developed during the employment; and (9) whether the forbidden employment is merely incidental to the main employment. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (citing *Raimonde*, 325 N.E.2d at 544). If a non-compete agreement is unreasonable, courts are empowered to modify the terms to create a reasonable covenant between the parties. *Rogers v. Runfola & Assoc. Inc.*, 565 N.E.2d 540, 544 (Ohio Sup. Ct. 1991).

Considering these factors and the evidence presented by the parties, the Court finds that Axcess has not carried its burden of showing that the Non-Compete is reasonable and enforceable in scope.[6]

**Time and Space Limitations.** The 2021 Non-Compete has a reasonable time limitation, and Brichler does not challenge it. *See Ak Steel Corp., v. Miskovich*, No. 1:14CV174, 2014 WL 11881029, at *15 (S.D. Ohio Apr. 17, 2014) ("[a]s for the one-

---

[6] In a footnote, Axcess states that "Defendant accepted the exact same role he held with Plaintiffs with a direct competitor 40 miles away" so even if the Non-Compete is overboard in some places it is not with regards to Brichler. (Doc. 24 at 19, n.4). Axcess further argues courts can impose injunctive relief after presuming a modification that would make a restrictive covenant reasonable. *Ak Steel Corp., v. Miskovich*, No. 1:14CV174, 2014 WL 11881029, at *16 (S.D. Ohio Apr. 17, 2014). Alas, Axcess makes no case for either a global limitation or a 40-mile radius. In general, it is simply not clear to this Court, without more information from Axcess, what modifications would make this Non-Compete presumptively reasonable.

year time limitation, it is facially reasonable under Ohio law") (collecting Ohio cases). The unlimited geographical scope requires more scrutiny. Ohio courts have accepted global restrictive covenants when the employer's operations are likewise global. *See e.g.*, *Convergys Corp. v. Wellman*, No. 1:07-CV-509, 2007 WL 4248202, at \*7 (S.D. Ohio Nov. 30, 2007).

Axcess here gives no fact-based justification for the global scope of the Non-Compete. Instead, it simply cites to cases where the global scope of a non-compete has been upheld. (Doc. 24 at 19). As Brichler points out, Axcess "fail[] to show how a global restriction is reasonable." (Doc. 14 at 34). The Court agrees that the absence of any substantive justification for a global scope weighs against Axcess here.

**Contact with Customers.** The evidence suggests Brichler did not have contact with customers at Axcess. Both parties describe his role as one where he managed teams who worked through software integrations and built data systems. This factor weighs in favor of Brichler.

**Confidential Information and Trade Secrets.** The Court analyzes confidential information here, and trade secrets in its own section *infra*. Plaintiffs contend Brichler possesses "confidential information," because Brichler worked on several components in Axcess's "technology stack." (Doc. 24 at 6). For example, Brichler developed customized integrations between third-party platforms—like LoanPro and GDS Link—and Axcess's proprietary software. (*Id.*). Brichler also implemented a series of "eligibility rules" that "govern consumer eligibility for certain produces and services." (Brichler Dep., 46:6-24). Brichler built-out fraud detection capabilities, working with a third-party.

13

(Davis Decl., ¶14). Finally, Brichler had access to strategic information like which companies Axcess targeted for acquisition, business plans and operations. (Plaintiff Dep., 30:6-31:19). The Court creates two sub-categories of analysis for the confidential information: technology projects and business strategy.

In general, it is Axcess' claim that Brichler's work on technology projects give him access to confidential information that he will be unable to compartmentalize in his employment with Lendly. However, the Court cannot conclude that Brichler's experience in crafting unique technological solutions, such as third-party platform integrations, by itself, imbues him with confidential information. The reasons are three-fold.

First, there is no evidence, circumstantial or direct, of disclosure of confidential information. Axcess argues that it is impossible for Brichler to compartmentalize his confidential knowledge and cite to Lendly planning documents showing Lendly may soon work on technology issues similar to those Brichler worked on at Axcess. (Doc. 24 at 30). True as that may be, the Court is not convinced, to take one of Axcess' examples, that because Brichler worked on automating the NOAA process in the Axcess system he will necessarily disclose confidential information if tasked with improving NOAA procedures for Lendly. It would be different if Axcess alleged that Brichler had simply re-built Axcess's NOAA functionality at Lendly or had plans to do so. But, even after getting the benefit of some discovery, Axcess makes no claims on that level.

Second, Brichler and his team developed third-party software integrations based specifically on Axcess's existing infrastructure such that the value of Brichler's knowledge to another company with its own infrastructure cannot be assumed. Axcess

readily and repeatedly asserts the extent to which Brichler and his team had to configure and reconfigure custom integrations so that programs like LoanPro—the loan management platform—could run seamlessly within Axcess's larger data infrastructure. (Doc. 24 at 7). Knowing the specifications of such a custom-build, it seems, may have limited value to Lendly—which integrated LoanPro before Axcess did. (Swartz Decl., at ¶¶ 26, 27).

The Court here notes that Axcess asserts confidentiality over both Brichler's technology solutions and the <u>processes</u> used to reach them. Axcess states, for example, that "[t]he selection of components to build outside of GDS Link, how those components were set up and further developed, and the middleware required to integrate GDS Link, Axcess' underwriting components, and LoanPro together are all proprietary and confidential information." (Doc. 24 at 8). With regards to the LoanPro integration, Axcess states that "[t]he decision-making process regarding which integrations to make and how, along with the resulting middleware itself is confidential and proprietary." (*Id.*).

Axcess, though, is unexacting in explaining which confidentiality concerns apply to the processes and which apply to the tangible results. Axcess makes no allegation that Brichler has taken—in his memory or on an external drive—anything tangible, like Axcess's middleware or proprietary underwriting components. Because of the customization involved, there is also little evidence that Brichler would inevitably disclose their specifications. As for the intangible items, like "the decision-making process" for the LoanPro integration, Axcess does not make a convincing argument for its confidentiality or propriety. As described by Axcess, Brichler and his team arrived at

15

the final LoanPro configurations through "learning," "re-prioritizing" and "trial and error." (Doc. 24 at 7-8, 22).  The gist of Axcess's claims suggests that the label of "confidentiality" may be stretched to everything within Brichler's ability—from his application of an iterative process like "trial and error" to his "knowledge of how" to create a custom solution for NOAAs.

This is prologue to the Court's third issue with the allegedly confidential information Brichler is said to possess: it is not clearly distinguished from Brichler's general skills and knowledge of his trade. *Jacono v. Invacare Corp.*, 2006-Ohio-1596, 2006 WL 832451, (Ohio Ct. App. 2006).  The line between general know-how and confidential information may not be a bright one. That said, it is Axcess's burden to prove the reasonableness of its Non-Compete as it seeks to have it enforced. Shouldering that burden, Axcess fails to direct the Court to relevant authority suggesting that knowledge of how to devise custom solutions to recurring industry problems is "confidential."

With regards to Brichler's technology projects, Axcess may yet prove that the information it seeks to protect is confidential and impossible to compartmentalize. At this stage, it is not clear to the Court that Brichler has disclosed or inevitably will disclose such information. As for the confidentiality alleged over more generalized know-how and common process-skills like trial-and-error, the Court is not convinced such is properly considered confidential.

Brichler's access to allegedly confidential business strategy, broadly categorized, is a closer question.  Axcess does identify at least one discrete piece of information that

16

could benefit a competitor if disclosed. This information is related to "acquisition targets" or "partnerships" related to third-party "lead buy"[7] services. (Plaintiff Dep., 30:6-31:19). It is straightforward and intuitive that such information, if disclosed, could benefit a competitor because another company could unfairly compete for the same partnership or acquisition.

However, there is no allegation that Brichler has disclosed such information and it is not clear that it would be helpful to Lendly. Lendly is not pursuing partnerships or acquisitions for lead buy services. (Swartz Decl. at ¶31). Moreover, Lendly, given its current market position, is likely not a competitor with Axcess for acquisition targets anyway. For this reason, while the Court agrees the information is confidential, it cannot conclude that it is of value to Lendly specifically or that Brichler must disclose it to fulfill his obligations for Lendly.[8]

The rest of Axcess's assertions are about confidential information are simply too abstract or conclusory. Axcess asserts Brichler "was privy to confidential and proprietary information regarding Axcess' business and operations, including with respect to Axcess' financial information, marketing strategies, growth metrics and operational information, and including business performance and current and future initiatives." (Doc. 24 at 10). But Axcess has eschewed any explanation of what this information actually is and why it

---

[7] Lead buy services refer generally to a third-party finding eligible consumer for loan products. (Plaintiff Dep., 30:6-31:19).

[8] Per the Court's ultimate Order, *infra.*, Brichler is not to disclose whatever confidential information he may have.

is confidential.

As discussed more in-depth *infra.*, Axcess also fails to convince the Court it has a reasonable likelihood of success on the merits of its trade secrets claim. Accordingly, this factor favors Brichler.

**Limiting Unfair or Ordinary Competition**.  This factor considers whether the Non-Compete prohibits not only unfair competition but stifles ordinary competition.  In the common law sense, unfair competition usually involves the "subjective intent to injure [another] party's ability to be competitive." *Am. Chem. Soc. v. Leadscope, Inc.*, 2012-Ohio-4193, ¶ 93, 133 Ohio St. 3d 366, 392, 978 N.E.2d 832, 855 (Ohio 2012). "The concept of unfair competition may also extend to unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another." *Water Mgmt., Inc. v. Stayanchi*, 15 Ohio St. 3d 83, 85, 472 N.E.2d 715, 717 (Ohio 1984).

The breadth of the Non-Compete here suggests it restrains more than unfair competition.  According to Axcess, the Non-Compete prohibits Brichler from taking any job with any sub-prime or unsecured personal lending company anywhere in the world. (Plaintiff Dep. at 121-123).  Seemingly, the Non-Compete would operate to do so whether or not Brichler stole customers or trade secrets; whether or not Brichler had the subjective intent to harm Axcess's competitive capacity; and whether Brichler went to work for a juggernaut or an upstart.

18

To that last point, the Court is not convinced the two companies are "competitors"[9] beyond the fact that they both exist in the sub-prime personal lending space. Axcess has over 1000 employees, around 650 brick-and-mortar stores, and originates loans in addition to servicing them. Plaintiff Dep. 56:8-23. Lendly, on the other hand, has around 100 employees, seemingly no brick-and-mortar stores, and, now at least, does not originate loans. (Deposition of Andrew Swartz, "Swartz Dep.," 48:18, 71:23).

For these reasons, this point cuts in favor of Brichler.

**Stifle Employee's Inherent Skills/Employees Skills Developed During Employment/Benefit to Employer and Detriment to Employee/Employee's Sole Means of Support.**

Brichler has now worked around five years in sub-prime consumer loans industry. (Brichler Decl. at ¶5).  At the end of his Axcess term, he held the role of CTO. (*Id.* at ¶6).  Brichler took the same position at Lendly but states he did so to advance his career. (*Id.* at ¶19).  It is not clear whether Brichler could easily transfer his skillset to a similar role in, for example, mortgages or large-scale commercial lending.  It does seem safe to conclude that enforcement of the Non-Compete would not foreclose his sole means of support—a point in Axcess's favor.

The record is also not clear on the source of Brichler's skills.  Axcess points out that before joining Axcess Brichler had no experience in the consumer loan industry. (Doc. 24 at 3).  But Axcess undercuts the implication that they are responsible for

---

[9] Sibila suggests he is generally not focused on Axcess's competitors and that he only knew of Lendly once Brichler went to work there. Plaintiff Dep. 61:2-15.

Brichler's development by highlighting the extent to which Brichler's work involved a trial-and-error process. (*Id.* at 8). Axcess makes no mention of any attempts to specifically train Brichler. Considering the extent to which Axcess seeks to enforce the Non-Compete against generalized problem-solving skills, this point falls in Brichler's favor.

The comparative benefit to the employer and detriment to the employee is straightforward. Brichler would have to lose or standdown from his job if the non-compete were enforced. Brichler, as mentioned, considers his employment with Lendly a career-advancing move. Of course, such a detriment would be the result of his breach. *See Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 855. Axcess contends that the enforcement of the Non-Compete would protect its proprietary information and prevent unfair competition but the existence and disclosure of confidential information is still in question. Axcess also gave Brichler special compensation incentives in consideration for signing the Non-Compete. (Doc. 24 at 5, n.3). If the Non-Compete goes unenforced, Axcess would arguably lose the benefit of providing such incentives.

When considering the foregoing, these factors weigh slightly in favor of Axcess.

**Forbidden Employment Incidental to the Main Employment.** Here the evidence is in conflict and seems to come down to the level of generality in which the respective roles are explained. Axcess highlights the similarities—the job title, the third-party software vendors, and the industry. Brichler argues he will simply apply his general skills and knowledge; that he will operate in a managerial function and work closely with a single product for which Axcess has no equivalent.

20

The divergent descriptions notwithstanding, the overlap in roles seems substantial enough to conclude that this factor falls in Axcess's favor.

**Summary of Factors.** There are many factors that weigh in favor of Axcess and finding the agreement reasonable: the one-year time limitation; the possibility that Brichler does possess some, even if minimal, confidential information; Brichler's compensation package in consideration for the Non-Compete; the fact that Brichler is not likely to lose his sole means of support; and the fact that Brichler has gone to work in a somewhat similar role for a sub-prime personal lending company. But, the remaining factors, at this preliminary stage, demonstrate that enjoining Brichler's employment with Lendly and enforcing the agreement would be unreasonable. Axcess lacks justification for the global scope of the Non-Compete. Brichler is not, and was not with Axcess, in a customer facing position. Brichler would face detriment if the agreement were enforced, forcing him to forego a career advancement opportunity. The Non-Compete, as Axcess seeks to enforce it, eliminates ordinary, not only unfair, competition. And, Axcess is likely not prejudiced to the extent Brichler has knowledge of any of Axcess's purported confidential information. The Court is particularly concerned that Axcess seeks to enforce this Non-Compete against general processes Brichler applied to solve novel technology issues on the basis that such processes are "confidential." Such could constitute a restraint on Brichler's inherent skill.

Thus, considering the foregoing, Axcess has not met its heavy burden of showing that the Non-Compete is reasonable and enforceable, and, at this preliminary stage, the Court cannot conclude that Axcess has shown a substantial likelihood of success on the

merits on its breach of contract claim.

## 2. Misappropriation of Trade Secrets

Axcess's second claim against Brichler is for misappropriation of trade secrets. An "[a]ctual or threatened misappropriation" may be enjoined. Ohio Rev. Code § 1333. 62(A). Under Ohio law, a "trade secret" is defined as:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code. § 1333.61(D); *see also Handel's Enterprises, Inc. v. Schulenburg*, 765 Fed. App'x. 117, 122 (6th 2019). "An entity claiming trade secret status bears the burden to identify and demonstrate that the material is included in categories of protected information under the statute and additionally must take some active steps to maintain its secrecy." *Id*.

To succeed on a claim under this statute, a plaintiff must demonstrate the following by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *MEMC Elec. Materials, Inc. v. Balakrishnan*, No.

22

2:12-cv-344, 2012 WL 3962905, at *6 (S.D. Ohio Sept. 11, 2012) (citing *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008)). Under the inevitable disclosure doctrine, a <u>threatened</u> misappropriation of trade secrets can be shown by "facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Polymet Corp. v. Newman*, Case No. 1:16-cv-734, 2016 WL 4449641, at *4 (S.D. Ohio Aug. 24, 2016) (citing *Proctor & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 279 (Ohio Ct. App. 2000)).

In this case, Axcess has not carried its heavy burden of showing a likelihood of success on the merits of its trade secret claim. Axcess designates the following as trade secrets: (1) implementation of LoanPro; (2) integration of GDS; (3) implementation of loan origination services; and (4) design and implementation of a proprietary underwriting engine. (Doc. 2). In its reply, Axcess further lists (5) fraud detection and (6) regulatory monitoring functionality with regards to NOAA notices. (Doc. 24).

Since Axcess does not provide evidence of direct misappropriation, it necessarily relies on the inevitable disclosure doctrine. As described above, the Court is content with Axcess's showing that Brichler is working for Lendly in a position substantially similar to his role at Axcess. Notwithstanding doubts about their status as competitors, the Court assumes, for current purposes, that Lendly is a competitor of Axcess. The Court now turns to the arguments.

In a typical way of framing its trade secret claims, Axcess argues that:

> Both the design of the LoanPro implementation, consisting of months of re-prioritizing, re-ordering and trial and error to arrive at optimal configurations, as well as the individual middleware integrations Defendant and his teams built that allow various components to work together on LoanPro's unified platform, constitute proprietary information and Axcess' trade secrets. (Doc. 24 at 22).

Further refining the argument, in part to rebut Brichler's claim that Lendly already had a robust LoanPro integration, Axcess states:

> As long as Lendly continues to use LoanPro, Defendant will inevitably draw upon the knowledge he acquired in developing custom solutions to enhance Axcess' use of the platform, it will be impossible for Defendant to compartmentalize the knowledge he acquired through months of trial and error developing middleware and integrating data and components with LoanPro. (*Id.*).

It is important to recall that Axcess does not allege actual misappropriation by Brichler of "the design of LoanPro implementation" or "individual middleware integrations" or any other component of the projects he worked on. There is no claim that Lendly has copied versions of the "solutions" Brichler developed at Axcess. And indeed, Axcess's argument is that because Brichler cannot compartmentalize such trade secrets, he will inevitably disclose them.

This argument must fail because, at this stage, Axcess has not shown clear and convincing evidence of a trade secret. A few problems present.

As an initial matter, Axcess has not demonstrated the "independent economic value" of the trade secrets it alleges. As for such projects like the LoanPro "implementation design" and its "middleware," the highly customized specifications suggest they might not derive their independent value, if any, from not being generally

known to a competitor.[10] Brichler and his team had to customize those designs and integrations for Axcess's existing infrastructure. (Doc. 24 at 21). For that reason, their independent value of not being known to a competitor with its own infrastructure is simply not a given.

These integrations and other technology solutions may have independent economic value from not being known to competitors. The Court, though, cannot assume it. And Axcess has not demonstrated such value.

Second, Axcess does not show that the alleged trade secrets cannot be ascertained by "proper means." Brichler and his team arrived at many of their solutions through trial and error rather than any proprietary design. This suggests that competitors may arrive at similar solutions through a general process. *See Brakefire, Inc. v. Overbeck*, 2007-Ohio-6464, ¶ 25, 144 Ohio Misc. 2d 35, 52, 878 N.E.2d 84, 96 (Ohio 2007).

Last, as with the confidential information claim, Axcess fails to fully distinguish Brichler's general skills from a trade secret. Axcess again assumes Brichler's know-how can be restrained—this time, as a trade secret.

Axcess contends, for example, that "[i]t will be impossible for Defendant to avoid using his knowledge developed at Axcess about how to improve core underwriting functions that are essential to Lendly's business." (Doc. 24 at 23). In another attempt to identify a trade secret, Axcess claims, "[a]s Lendly explores and builds custom NOAA

---

[10] Axcess representatives do state that the fraud detection platform was a "differentiator." Plaintiffs Dep 135:25. But Plaintiffs also seem "unsure" about Brichler's role in the fraud detection development. Plaintiffs Dep. 135:18.

compliance solutions, it will be impossible for Defendant to compartmentalize and avoid using his knowledge of how to develop and implement such a solution." (*Id.* at 24).

The Court is hesitant to determine that Brichler's "knowledge of how" to customize a technology solution to a recurring industry issue, like NOAAs, is a trade secret. In such instances, there is little to distinguish the alleged trade secrets from Brichler's general ability as a technology professional. Outside of trade secrets, "[a]n employee may use his knowledge and experience, for the benefit of [a] new employer." *A&P Tech., Inc. v. Lariviere*, No. 1:17-CV-534, 2017 WL 6606961, at *6 (S.D. Ohio Dec. 27, 2017) (internal citations omitted).

The trade secrets recognized by courts in cases relied upon by Axcess, moreover, are generally more discrete and often related to products or customers. Moreover, even in inevitable disclosure cases, courts can usually pinpoint some circumstantial evidence of misappropriation.

For example, in *Polymet v. Newman*, the plaintiff alleged a trade secret claimed over, among other things, its specifications for a one-of-a-kind hot extruded wire. No. 1:16-CV-734, 2016 WL 4449641, at *1 (S.D. Ohio Aug. 24, 2016). *Polymet* also involved direct evidence of customer stealing and an allegation of misappropriation. *Id.* at *4. On the surface, *ALTA Analytics, Inc. v. Muuss* appears on all fours with Axcess's trade secret because that case determined that the company's "software's unique technology, design, and marketing features" warranted trade secret protection. 75 F. Supp. 2d 773, 785 (S.D. Ohio 1999). But Alta Analytics <u>sold</u> the software in question and

there was direct evidence of misappropriation by an employee who left for Alta Analytics' only competitor. *Id.*

In other cases, such as *Goken Am., LLC v. Bandepalya*, the trade secret is not described in explicit terms but it is inferable. No. 2:14-CV-1445, 2014 WL 6673830, at *6 (S.D. Ohio Nov. 24, 2014). The *Goken* court states the defendant "copied onto his external hard drive information that a reasonable business owner would not want a competitor to know" including 8,659 files from a restricted folder. *Id.* In *Dayton Superior v. Yan*, the plaintiff alleged that the defendant had "contacted several of [plaintiff's] customers, offering products for sale that were identical or similar to [plaintiff's] products." 288 F.R.D. 151, 159 (S.D. Ohio 2012).

The alleged trade secret here bears more in common with the "operational" knowledge claimed as a trade secret in *Concentrix v. Daoust*. *See* No. 1:21-CV-131, 2021 WL 1734284 (S.D. Ohio May 3, 2021). There, as here, a high-ranking employee operated in a non-customer facing role. *Id.* There was no evidence that defendant took anything with him on his way out except his knowledge of "the manner [the employer] organizes and manages its call-center teams." *Id.* at *16. In denying injunctive relief, this Court found the plaintiff failed to carry its burden in showing its operational procedures were a trade secret. *Id.*

Here, Axcess has likewise failed to identify and demonstrate a trade secret by clear and convincing evidence. It has not shown that Brichler's knowledge of middleware or custom integrations derive their independent value from not being known to competitors. It has also not demonstrated by clear and convincing evidence that the processes Brichler

27

used to do his work are trade secrets rather than a general skill widely practiced in the industry. Furthermore, Axcess has not provided even circumstantial evidence of misappropriation of any tangible or intangible asset. While Axcess is not required to prove actual misappropriation under the inevitable disclosure doctrine, its inability to coherently describe what Brichler <u>will</u> <u>inevitably</u> <u>appropriate</u> is telling. As with the plaintiff in *Lavierre*, Axcess here "[f]ails to answer the question of exactly what…[defendant] is alleged to have taken with him when he left…." No. 1:17-CV-534, 2017 WL 6606961, at *10 (S.D. Ohio Dec. 27, 2017).

### B. Irreparable Harm

The second preliminary injunction factor is whether the moving party will suffer irreparable harm if the injunction is not issued. A plaintiff's harm is irreparable if it cannot be fully compensated by money damages. *Overstreet v. Lexington-Fayette Urban County Gov't.,* 305 F.3d 566, 578 (6th Cir. 2002). "[T]o demonstrate irreparable harm under the preliminary injunction test, a plaintiff must show that they will suffer "'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Cincinnati Indus. Mach., Inc. v. VMI Holland BV*, No. 1:09-CV-604, 2010 WL 597820, at *12 (S.D. Ohio Feb. 17, 2010) (cleaning up).

Axcess first argues that the duly-executed Non-Compete itself states that a breach of its restrictive covenants "will cause, in addition to any monetary damage, irreparable damage to the Company for which monetary damages alone will not constitute an adequate remedy." (Doc. 24 at 28; Doc. 1-2 at ¶4.1). Relying on *York Risk v. Couture*, Axcess states that "a contractual stipulation to irreparable harm is one piece of evidence

28

to consider in finding irreparable harm." (Doc. 24 at 29), *see* 787 F. App'x 301, 308 (6th Cir. 2019). The Court, duly, accepts the Non-Compete provision as "one piece" of evidence.[11]

But the Court must also discount the weight of this stipulated "irreparable harm" based on its blunt, foretelling posture. By stating that "any" future breach of the material terms of the Non-Compete "will" cause irreparable harm, the document manifests a certainty that would not be available to the parties who signed it. While it is evidence, it will not suffice on its own to show the inadequacy of monetary damages.

Additionally, Axcess cites *Certified Restoration Dry Cleaning v. Tenke* for the proposition that "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm employer." 511 F.3d 535, 550 (6th Cir. 2007). The Court notes that the irreparable harm in *York Risk* and *Tenke* both result from the solicitation of customers and the ensuing loss of "customer goodwill." *York Risk*, 787 F. App'x at 307; *Tenke*, 511 F.3d at 549. The customer solicitation in those cases also helps explain why movants could credibly allege a "loss of fair competition." *Id.* The Court cannot accept, however, Axcess's implied assumption that any breach of a non-compete, regardless of reasonableness, always results in a loss of fair competition.

In any case, if Axcess has lost its ability to fairly compete, it does not say how. On the record before the Court, there is no evidence that Axcess has suffered a loss of

---

[11] In *York Risk*, the stipulated language was not the only piece of evidence. That court held that "[w]e need not decide if language in a contract presuming irreparable harm is sufficient to show irreparable harm, however, because the district court made other findings sufficient to make that showing here. *York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 308 (6th Cir. 2019).

customer goodwill. Brichler has not taken Axcess's customers or employees. While Brichler is not long into his employment with Lendly, there is no suggestion that his hiring was part of a larger plan to target Axcess specifically or to pre-empt Axcess's product offerings. *Cf. Stoneham*, 140 Ohio App. 3d at 275 (finding a defector from Plaintiff's company could use knowledge to destroy the "marketability of [an ex-employer's] product").

An alternative way to establish the inadequacy of a legal remedy is to show that monetary damages are difficult to calculate. In *Basicomputer*, for example, employees absconded en masse with customer information and used that information at a competing retailer. 973 F.2d at 512 (6th Cir. 1992). The movant testified that, although the company could calculate some harm directly, there was no way to measure the "unfair price situation" with regards to the competing company. *Id.*

Axcess does not say that its damages would be impossible to calculate. To be sure, Axcess is not here required to give complete proof of "inadequacy of money damages." At the same time, Axcess cannot merely assume the inadequacy of monetary compensation from a boilerplate agreement that portends to foresee the proper measure of damages notwithstanding the nature of the breach. Accordingly, the Court finds Plaintiffs have not demonstrated irreparable harm by clear and convincing evidence.

Having already found that the Axcess cannot, as of now, demonstrate a trade secret by clear and convincing evidence, the Court does not engage on subject of irreparable harm with regards to its trade secret claims.

### C.  Harm to Others

The third preliminary injunction factor is whether granting the injunction would cause harm to others. "The irreparable injury [the plaintiff] will suffer if [its] motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting of injunctive relief." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). If injunctive relief were granted, those harmed would be Defendant Brichler and non-party Lendly. But this harm would be largely of the parties' own making. The evidence shows Lendly expected to deal with the Non-Compete issue when it hired Brichler. (Doc. 23-10). If enforced, Lendly would have to wait out the Non-Compete period or hire another person to fill the role.  This is not the kind of harm that would move the Court, without more context, to refrain from issuing injunctive relief.

Accordingly, the Court finds little reason to believe injunctive relief would cause significant harm to third parties.

### D.  Public Interest

The final preliminary injunction factor is whether granting the injunction would harm the public interest.  Under Ohio law, "[p]reserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest." *Total Quality Logistics, LLC v. OTC Logistics LLC*, No. 1:19-CV-151, 2019 WL 1300223, at *5 (S.D. Ohio Mar. 21, 2019) (quoting *UZ Eng'red Prods. Co. v. Midwest Motor Supply Co., Inc.*, 770 N.E.2d 1608, 1081 (Ohio Ct. App. 2001)). Setting aside reasonableness, the evidence suggests Brichler and Lendly were probably aware that

Axcess considered a company like Lendly a competitor according to the Non-Compete. Brichler went to work at Lendly anyway. On other hand, as mentioned, Lendly's hiring of Brichler does not constitute "unfair competition" on its own and there is very little other evidence of unfairness.

Contrastingly, there is also an interest in "not restricting employment opportunities for employees." *Convergys*, 2007 WL 4248202. As already stated, at this stage of the litigation, the relief requested by Axcess appears similar, in the Court's eye, to a broader restraint on Brichler's skill as a technology professional. For intuitive reasons, a decision from this Court imposing injunctive relief without a principled distinction between general skill and a trade secret could harm the public interest.

Based on the foregoing, this element weighs slightly against the issuance of a preliminary injunction.

In balancing the four factors pertaining to injunctive relief, the Court finds Axcess has not sustained its heavy burden of establishing that it is entitled to a preliminary injunction.

Having found this, the Court reiterates its finding that the Non-Compete is a valid agreement[12] between Brichler and Axcess, *even if* Axcess has not proven at this stage, by clear and convincing evidence, that it is reasonable as Axcess would have it enforced against Brichler. Brichler, therefore, shall continue not to solicit or attempt to solicit any

---

[12] In addition to being facially valid, the Court has also found that the most recent Non-Compete supersedes an earlier-in-time arbitration agreement executed by the parties. (Doc. 37). For that reason, the Court denied Defendant's motion to compel arbitration. (*Id.*).

of Axcess's customers known to Brichler; solicit or attempt to solicit any of Axcess's

employees; or provide any actual trade secret or confidential information in his

possession to Lendly.

## IV.  CONCLUSION

Based upon the foregoing, Plaintiffs' motion for a preliminary injunction (Doc. 2)

is **DENIED.** Defendant's motion for leave to file a sur-reply (Doc. 25) is **DENIED as**

**moot.**

**IT IS SO ORDERED.**

Date:    9/14/2021            *s/Timothy S. Black*
                            Timothy S. Black
                            United States District Judge