**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **CNG FINANCIAL CORPORATION**<br>**7755 Montgomery Road**<br>**Suite 400**<br>**Cincinnati, Ohio 45236** | |
| | **Case No. 1:21-cv-00460** |
| **AXCESS FINANCIAL SERVICES, INC.**<br>**7755 Montgomery Road**<br>**Suite 400**<br>**Cincinnati, OH 45236** | **JUDGE TIMOTHY S. BLACK**<br>**Magistrate Judge Stephanie K.**<br>**Bowman** |
|          **Plaintiffs** | |
| **v.** | **Demand for Jury Trial**<br>**With Respect to Count IV** |
| **ROBERT BRICHLER**<br>**3839 Germania Street**<br>**Cincinnati, OH 45227** | |
| **LENDLY, LLC**<br>**105 Sugar Camp Circle**<br>**Dayton, OH 45409** | |
|          **Defendants.** | |

**PLAINTIFFS' VERIFIED FIRST AMENDED COMPLAINT**

Plaintiffs CNG Financial Corporation ("CNG") and Axcess Financial Services, Inc. ("Axcess") (collectively, "Plaintiffs") hereby file their Verified First Amended Complaint for against Defendants Robert Brichler ("Brichler") and Lendly, LLC ("Lendly") (collectively, "Defendants") and state as follows:

**NATURE OF THE CASE**

1. Plaintiffs bring this action for injunctive relief and damages arising out of its former Chief Technology Officer's brazen violation of restrictive covenants he agreed to with Plaintiffs in exchange for generous compensation and benefits opportunities. Plaintiffs seek to 1) enjoin their former executive, who created and implemented the confidential and proprietary technology platform that drove Axcess's on-line products and who had intimate access to Plaintiffs' highest confidential, proprietary and trade secret information, and his new employer, from unlawfully competing with Plaintiffs and misappropriating Plaintiffs' trade secret and confidential information in direct violation of the former executive's contractual and statutory obligations to Plaintiffs; and 2) recover the damages caused by their violations.

**PARTIES, JURISDICTION AND VENUE**

2. Plaintiff CNG is a corporation organized and existing under the laws of the State of Ohio. Its principal place of business is Cincinnati, Ohio. CNG owns various subsidiaries that provide financial products and services for a wide variety of consumer needs, including by offering loan servicing products.

3. Plaintiff Axcess is a company organized and existing under the laws of the State of Ohio. Its principal place of business is Cincinnati, Ohio. Axcess services short-term loans offered to underserved consumers that are originated and funded by a third-party banking partner across the United States. CNG is the ultimate parent company of Axcess.

4. Defendant Robert Brichler is a former executive of Plaintiffs, until very recently serving as CTO of Axcess. He is a citizen of Ohio who, upon information and belief, currently resides at 3839 Germania Street, Cincinnati, Ohio 45227.

5. Defendant Lendly is a limited liability company organized and existing under the laws of the State of Ohio. Upon information and belief, its principal place of business is Dayton, Ohio. Defendant Lendly also provides short-term loan servicing products targeted to the subprime market.

6. Jurisdiction is conferred pursuant to the 28 U.S.C. § 1331, as this action arises under the laws of the United States, specifically, under 18 U.S.C. § 1836 *et seq*., the federal Defend Trade Secrets Act of 2016 ("DTSA"). The remaining claims are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as the claim under the DTSA.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), as Defendant Brichler resides in this district, and 28 U.S.C. § 1391(b)(2), and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

8. This Court has personal jurisdiction over Defendant Brichler, including because he expressly agreed that "[a]ny dispute among the parties related to compliance with or the breach of any term of [the Non-Compete Agreement] shall be exclusively litigated in a state or federal court of competent jurisdiction in Hamilton County, Ohio," and that he "consent[s] to venue and personal jurisdiction in such forum." (Ex. A, Non-Compete Agreement, ¶ 9.5)

9. This Court has personal jurisdiction over Defendant Lendly. A court has personal jurisdiction over a corporation in the place of incorporation and the location of its principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). In this case, upon information and belief, Defendant Lendly is organized under the laws of Ohio with its principal place of business in Dayton, Ohio.

## FACTUAL BACKGROUND

10. CNG and its subsidiary Axcess are leaders in the consumer financial services industry, providing a wide range of convenient, approachable financial products and services that improve consumers' financial situations by meeting their lifestyle and budgetary needs. CNG companies provide retail and online short-term installment loan products for underserved consumers throughout the United States, including through CNG brands Check 'n Go and Allied Cash Advance. Axcess, as a service provider for a bank, services the "Xact Loan," an online-only short-term personal installment loan originated and funded by a third-party banking partner.

11. Defendant Lendly, newer to the short-term personal installment loan industry, like Axcess is not a direct lender but similarly services short-term personal loans originated and funded by a third-party banking partner. Defendant Lendly, like Axcess, utilizes an internet-based platform on which users fill out an on-line personal loan application.

12. Plaintiffs' confidential, proprietary and trade secret information is critical to maintaining a competitive position in the consumer financial services and short-term personal installment loan industry, and accordingly, Plaintiffs take a number of steps to protect the confidentiality of their information, including: (a) requiring employees to execute nondisclosure, non-compete and non-solicitation agreements; (b) maintaining and promulgating policies relating to information security, systems access and device use; (c) implementing electronic security measures, such as use of passwords; and (d) employing physical security measures, such as placing locks on offices, doors and file cabinets.

**DEFENDANT BRICHLER'S EMPLOYMENT WITH PLAINTIFFS AND CREATION OF AND ACCESS TO PLAINTFF'S CONFIDENTIAL, PROPRIETARY AND TRADE SECRET INFORMATION**

13. Defendant Brichler began employment with Axcess as its Vice President, Software Engineering in or around May 2016. In February 2020, Axcess promoted Defendant Brichler to the position of Chief Technology Officer.

14. As a condition of his employment with Axcess, Defendant Brichler signed an Employee Confidentiality, Noncompetition, Nonsolicitation Agreement on or about March 27, 2017. As a condition of his continued employment with Axcess and in exchange for the ability to participate in several employee incentive plans, on or about February 21, 2021, Defendant Brichler executed a second Employee Confidentiality, Noncompetition, Nonsolicitation Agreement (the "Non-Compete Agreement"). A true and correct copy of the Non-Compete Agreement is attached hereto as **Exhibit A**.

15. Pursuant to the Non-Compete Agreement, Defendant Brichler agreed to refrain from competing against Plaintiffs for a period of twelve months following the termination of his employment for any reason. *See* Ex. A, Non-Compete Agreement, at ¶¶ 3.1–3.1.1.

16. Specifically, the Non-Compete Agreement contains the following limited non-competition restrictions:

> *During Employee's employment and for a period of twelve (12) months following Employee's termination of employment for any reason* (collectively, the "Restricted Period"), *Employee will not compete against or engage in activities in preparation for competing against the Company.* Employee will be deemed to be competing with the Company if he/she is ... employed by, works for, becomes associated with in a similar or other capacity…, furnishes information to, or communicates with any of the Company's customers, potential customers, vendors, business associates, consultants or advisors … on behalf of: ... any person or entity that competes with the Company or that may reasonably be construed to compete with the Company, including but not limited to any company that engages in the business of deferred presentment services, *subprime short term and/or*

> ***unsecured lending services,*** company that engages in subprime title loans and check cashing, ***no credit required leasing or rent to own,*** or any other business in which the Company engages, or in which the Company is actively considering and planning to invest or participate.

(Ex. A, Non-Compete Agreement, at ¶¶ 3.1–3.1.1) (emphasis added).

17. The parties further expressly agreed that, if any provision in the Agreement shall for any reason be held to be unenforceable in any respect, such unenforceability shall not affect any other provision of the Agreement, and the ***Agreement shall be construed as if such unenforceable provision were modified, with its general intent, to the extent necessary so that it shall be enforceable***. (Ex. A, Non-Compete Agreement, at ¶8.4) (emphasis added).

18. Defendant Brichler also agreed not to "use, divulge, disclose, reveal, or communicate, other than as required in the performance of [his] duties for [Axcess], any Confidential Information [of Plaintiffs'] for so long as such Confidential Information is not publicly available[.]" (Ex. A, Non-Compete Agreement, at ¶¶ 1.1–1.2).

19. During his tenure with Axcess, Defendant Brichler gained an in-depth understanding of Plaintiffs' confidential processes, procedures, materials, intellectual property and platforms.

20. Most recently in his role as Chief Technology Officer, Defendant Brichler was responsible for overseeing Axcess' technology-related functions, including, among other things, planning and implementing strategies related to enterprise infrastructure, technology architecture, data management and IT governance. Defendant Brichler also managed a team of six employees engaged in software engineering, enterprise architecture, and database management.

21. As Chief Technology Officer, Defendant Brichler routinely participated in executive-level meetings and planning sessions with various business teams throughout the organization and reported to Plaintiffs' Board of Directors on matters related to technology, data security and data privacy.

22. As Chief Technology Officer, Defendant Brichler participated in Executive Leadership Team meetings where confidential strategic matters were discussed and at which key strategic decisions were made. Defendant Brichler served as the decision-maker for matters related to Plaintiffs' technology during Executive Leadership Team meetings and otherwise over the course of his employment.

23. As Chief Technology Officer, Defendant Brichler served as a member of Plaintiffs' compliance committee, through which he received exceptionally sensitive and confidential internal communications relating to Plaintiffs' business.

24. As Chief Technology Officer, Defendant Brichler served as a member of Plaintiffs' credit committee, through which Defendant Brichler participated in planning, strategy, discussion and development of Plaintiffs' signature bank-loan servicing program.

25. As Chief Technology Officer, Defendant Brichler attended off-site strategic sessions with key stakeholders and decision-makers where goals, ideas, platforms and significant intellectual property matters relating to Plaintiffs' business were discussed.

26. Given his status as a trusted executive, Defendant Brichler had knowledge of, access to, and in fact created, some of Plaintiffs' most sensitive and valuable confidential and trade secret information, including, but not limited to, Plaintiffs' detailed business plans and strategies, processes, methods, technology, intellectual property and platforms (the "Proprietary Information").

27. In particular, Defendant Brichler built software and systems to support Plaintiffs' key products and services. By way of example, Defendant Brichler built Plaintiffs' online loan application platform at the core of Plaintiffs' bank partnership program, including building the

code for the platform and enhancements, and integrating underwriting, fraud and other compliance check processes for the consumer-facing tools associated with the program.

28. Defendant Brichler also managed Plaintiffs' cloud infrastructure and platform migration and selected key strategic partners to provide technology and business services. Defendant Brichler was also charged with ensuring Axcess' IT platforms continued to reliably serve critical business functionality such as processing millions of loan applications.

29. At the time of his departure, Defendant Brichler was responsible for guiding the implementation and launch of major business initiatives, such as "Xact expansion," a technology update on the installment bank loan product serviced by Axcess, which functions very similarly to the bank loan product offered by Defendant Lendly.  Upon information and belief, Defendant Lendly has contracted with the same bank partner to offer its competitive products.

30. Defendant Brichler was responsible for evaluating, designing, and implementing Plaintiffs' use of specialized loan management, servicing and collections software offered by a third-party vendor, LoanPro.  Over a period of approximately one year, Defendant Brichler oversaw the process of identifying, designing custom middleware for, and applying the optimal configurations to integrate LoanPro's software into Plaintiffs' platforms and services.  Upon information and belief, Defendant Lendly has contracted with LoanPro to use the same software to support its competitive products.

31. Defendant Brichler was also responsible for designing and implementing Plaintiffs' integration with the LoanPro servicing system of a third-party lead buy and origination platform and service.  From March 2021 through the time of his resignation, Defendant Brichler was the main point of contact for all design elements of the solution, which is a novel implementation of the third-party's platform and provides Plaintiffs with a competitive market advantage.

32. Defendant Brichler was responsible for implementing Plaintiffs' use of a credit decisioning engine offered by a third-party vendor, GDS Link. Over a period of approximately four years, Defendant Brichler oversaw the process of implementing, and continuously maintaining the system to integrate Plaintiffs' proprietary loan origination platforms and services. Upon information and belief, Defendant Lendly has contracted with GDS Link to use the same software to support its competitive products.

33. Defendant Brichler also oversaw the design, development and implementation of Plaintiffs' proprietary underwriting engine, which integrates fraud, creditworthiness and other compliance checks with installment bank loan products Axcess services. The proprietary underwriting engine eliminates Plaintiffs' need to rely on third parties like GDS Link to provide similar functionality, resulting in significant cost savings and a competitive market advantage.

34. By virtue of his role as Chief Technology Officer, Defendant Brichler was uniquely positioned to both access and develop Plaintiffs' strategic plans and to build the technological tools to implement them. At the time of his abrupt resignation, Defendant Brichler possessed unparalleled knowledge of the systems, processes, software, platforms and intellectual property underlying Plaintiffs' products and services.

35. Defendant Brichler's exceptionally intimate knowledge of Plaintiffs' business, strategies and technology, and other confidential, proprietary and trade secret information would, if disclosed, provide Plaintiffs' competitors with an unfair competitive advantage.

**DEFENDANT BRICHLER RESIGNS TO JOIN A DIRECT COMPETITOR**

36. Defendant Lendly competes directly with Plaintiffs. According to its website, Defendant Lendly was created "with the intent to provide consumers a loan with non-traditional

underwriting methods and a convenient and affordable repayment structure.**"** *See* Lendly website, available at https://getlendly.com/#ourMission, last accessed November 12, 2021).

37.  Just like Axcess, Defendant Lendly services subprime short term or unsecured personal loans through third-party banking partners using an internet-based platform.  Defendant Lendly's consumer loan servicing products are nearly identical to certain servicing products offered by Axcess, and the two companies directly compete for the same customers.

38.  Indeed, in connection with their competing bank installment loan servicing products, Axcess and Defendant Lendly both have a business relationship with the same lending partner, and both have contracted with the same third-party vendors to provide business and technology services.

39.  Defendant Lendly actively targeted, recruited and solicited Defendant Brichler to leave his employment at Axcess and begin employment with Defendant Lendly as its new Chief Technology Officer, even after Defendant Brichler provided Defendant Lendly with a copy of the Non-Compete Agreement in May 2021.

40.  Unbeknownst to Plaintiffs at the time, Defendants Lendly and Brichler met multiple times in April, May and June 2021 to discuss Defendant Brichler joining Defendant Lendly as its Chief Technology Officer.

41. Upon information and belief, Defendant Lendly specifically discussed the Non-Compete Agreement internally and with Defendant Brichler prior to extending Defendant Brichler an offer of employment.

42. Upon information and belief, Defendants understood that Defendant Brichler's prospective employment as Defendant Lendly's Chief Technology Officer would violate the Non-Compete Agreement.

43. On June 11, 2021, Defendant Brichler informed Plaintiffs that he had been offered the role of Chief Technology Officer with Defendant Lendly, and that the opportunity to build up Lendly's IT function as he had done with Axcess was appealing. Plaintiffs reminded Defendant Brichler of his non-compete obligations that same day.

44. On June 14, 2021, Plaintiffs met with Defendant Brichler and again reminded him of his non-compete obligations. Plaintiffs additionally confirmed that they considered Defendant Lendly to be a direct competitor.

45. On June 15, 2021, Plaintiffs again met with Defendant Brichler and informed him that they would seek to enforce the Non-Compete Agreement if Defendant Brichler accepted employment with Defendant Lendly. During that meeting, Defendant Brichler verbally resigned his employment with Axcess, and later that day, submitted written notice of his resignation via email.

**PLAINTIFFS' EFFORTS TO CURB DEFENDANTS' UNLAWFUL CONDUCT**

46. On June 15, 2021, the day Defendant Brichler provided notice of his resignation from his employment with Axcess, Plaintiffs provided written notice to Defendant Lendly of Defendant Brichler's non-compete obligations and Axcess' intent to enforce such obligations. Plaintiffs also informed Defendant Lendly that Defendant Brichler's employment with Defendant Lendly would violate his Non-Compete Agreement and requested certain assurances from Defendant Lendly. A true and correct copy of Axcess' June 15, 2021 letter to Lendly is attached as **Exhibit B**.

47. On June 18, 2021, Plaintiffs provided Defendant Brichler with written notice of his legal obligations under the Non-Compete Agreement, as well as Plaintiffs' intent to enforce such obligations. The notice informed Defendant Brichler that he would be in violation of his continuing obligations to Plaintiffs if he accepted employment with Defendant Lendly and

requested assurances of compliance from Defendant Brichler. A true and correct copy of Axcess' June 18, 2021 letter to Defendant Brichler is attached as **Exhibit C**.

48. Neither Defendant Lendly nor Defendant Brichler provided Plaintiffs with adequate assurances of compliance with their respective legal obligations.

### DEFENDANT BRICHLER'S EMPLOYMENT WITH DEFENDANT LENDLY

49. Shortly after Defendant Brichler's resignation, Plaintiffs learned that Defendant Brichler had accepted employment with Defendant Lendly as its Chief Technology Officer, *the same position he held with Axcess*, and began working for Defendant Lendly in that capacity in late June 2021.

50. By accepting employment with Defendant Lendly, Defendant Brichler has violated the terms set forth in Paragraphs 3.1 and 3.1.1 of the Non-Compete Agreement by working for a direct competitor in the same or similar role within the 12-month restricted period prescribed by the Non-Compete Agreement.

51. Defendant Brichler's current role with Defendant Lendly is virtually identical to the role he held with Axcess. Upon information and belief, in his role as Defendant Lendly's Chief Technology Officer, Defendant Brichler will perform the same or substantially similar duties to those he performed for Axcess, including, but not limited to, serving as an executive of the company, overseeing the technology function at Defendant Lendly and building out software and systems to support Defendant Lendly's consumer products using the same methods and processes underlying Plaintiffs' product offerings.

52. Upon information and belief, as Defendant Lendly's Chief Technology Officer, Defendant Brichler is responsible for overseeing Defendant Lendly's technology-related functions; managing Defendant Lendly's cloud infrastructure and platforms; devising Defendant

Lendly's technology and other strategies; and managing Defendant Lendly's technology team, all of which were core responsibilities Defendant Brichler carried out while employed by Axcess.

53. For example, as Chief Technology Officer, Defendant Brichler has been involved with and included in Defendant Lendly's business strategies, including strategies relating to pricing, marketing, product development, market expansion, data use and analysis, underwriting modeling, and vendor selection and partnerships, among others.

54. As a result of Defendant Brichler's substantial knowledge of and access to Plaintiffs' confidential, proprietary and trade secret information, as well as Defendant Brichler's performance of substantially similar duties for Defendant Lendly as those he performed for Axcess, Defendant Brichler has disclosed or used or inevitably will disclose or use Plaintiffs' trade secrets in the course of his employment with Defendant Lendly, a direct competitor.

55. It will be impossible for Defendant Brichler to avoid using his knowledge of Plaintiffs' trade secrets and other confidential information while working as Defendant Lendly's Chief Technology Officer.

56. Defendant Brichler's use and disclosure of Plaintiffs' trade secrets has provided or will provide Defendant Lendly with an unfair competitive advantage and deprive Plaintiffs of the benefit of their investment in key personnel and resources to develop market-leading products and services.

57. Defendant Brichler's actions have caused and will continue to cause Plaintiffs to suffer immediate and irreparable injury, loss and damage.

**COUNT I**
**Breach of Contract**

58. Plaintiffs incorporate all preceding paragraphs of the Complaint as if fully set forth herein.

13

59. The Non-Compete Agreement constitutes a valid and enforceable contract.

60. Defendant Brichler's actions, as set forth herein, constitute a breach of the Non-Compete Agreement.

61. Defendant Brichler's employment as Chief Technology Officer for Defendant Lendly, a direct competitor, violated and continues to violate the primary covenant in the Non-Compete Agreement: "Employee will not for a period of twelve (12) months following Employee's termination of employment for any reason compete against or engage in activities in preparation for competing against the Company."

62. Defendant Brichler's acceptance of employment and continuation in his position of Chief Technology Officer with a direct competitor violates the non-competition obligation set forth in the Non-Compete Agreement. The Non-Compete Agreement specifically deems to be competitive employment in a similar role with any entity that competes with Plaintiffs, including any entity that engages in subprime short term and/or unsecured lending services.

63. Defendant Lendly directly competes with Plaintiffs, engages is subprime short-term lending services, and constitutes an "entity that competes" with Plaintiffs. Defendant Brichler's acceptance of employment with, and performance of work for, Defendant Lendly as its Chief Technology Officer violates the Non-Compete Agreement.

64. Plaintiffs performed under the Non-Compete Agreement and satisfied all relevant obligations thereunder.

65. Defendant Brichler has violated and will continue to violate the Non-Compete Agreement by through his employment position with Defendant Lendly.

66. Plaintiffs have a legitimate interest in protecting their confidential information and investment in developing software, source code, systems, platforms, infrastructures, architectures,

current and future products, business strategies and in their relationships with business partners by preventing Defendant Brichler from violating the Non-Compete Agreement to Plaintiffs' detriment.

67. The covenants in the Non-Compete Agreement were and are reasonably necessary to protect Plaintiffs' legitimate business interests and are no broader than necessary to effectuate that purpose.

68. Further, the Non-Compete Agreement requires that, if any provision were held not enforceable, it shall be construed as if such unenforceable provision were modified, with its general intent, to the extent necessary so that it shall be enforceable.

69. If Defendant Brichler's wrongful conduct is permitted to continue, Plaintiffs will continue to suffer substantial and irreparable injury to their business and their competitor will obtain an unfair advantage in the marketplace. Plaintiffs have no adequate remedy at law. Plaintiffs have also suffered direct and consequential damages, and are entitled to recover compensatory damages, attorneys' fees pursuant to the Non-Compete Agreement, and other damages in an amount to be proven at trial.

70. Plaintiffs are entitled to injunctive relief enjoining Defendant Brichler, his agents, and all persons acting in concert or participation with him, from unlawfully competing with Plaintiffs to Plaintiffs' detriment during a 12-month restricted period, as tolled, as set forth in the Non-Compete Agreement.

## COUNT II
### Violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. §1836

71. Plaintiffs incorporate all preceding paragraphs of the Complaint as if fully set forth herein.

72. As a result of his employment and position of trust with Plaintiffs, Defendant Brichler was provided access to Plaintiffs' trade secret information, including but not limited to, the Confidential Information.

73. The Confidential Information is used in connection with Plaintiffs' products and services that are offered across the country.

74. Plaintiffs have undertaken reasonable measures to safeguard their trade secret information.

75. The Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

76. Defendant Brichler was subject to a non-disclosure agreement that required that he maintain the confidentiality of the Confidential Information and prohibited him from using such information other than as necessary in the course of performing his duties for Plaintiffs and as authorized by Plaintiffs.

77. Upon information and belief, Defendant Brichler has used and/or disclosed, or inevitably will use and/or disclose, Plaintiffs' trade secret information, including the Confidential Information, for Defendant Brichler and Defendant Lendly's benefit and advantage.

78. Defendant Brichler's conduct constitutes knowing, willful and malicious misappropriation.

79. As a direct and proximate result of Defendant Brichler's wrongful conduct, Plaintiffs have been substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, Defendant Brichler will cause further irreparable injury to Plaintiffs. Plaintiffs have also suffered direct and consequential damages, and are entitled to

recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

**COUNT III**
**Violation of the Ohio Uniform Trade Secrets Act, O.R.C. § 1333.61 *et seq.***

80. Plaintiffs incorporate all preceding paragraphs of the Complaint as if fully set forth herein.

81. Plaintiffs entrusted Defendant Brichler with their confidential, proprietary and trade secret information, including the Confidential Information.

82. Plaintiffs have taken reasonable measures to maintain the secrecy of their trade secret information, including the Confidential Information.  The Confidential Information derives independent economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure.

83. Plaintiffs have undertaken reasonable measures to safeguard their trade secret information.

84. Defendant Brichler has misappropriated, or his conduct constitutes a substantial threat that he will misappropriate, Plaintiff's trade secret information, including the Confidential Information, by disclosing and/or using it to Defendant Brichler's and Defendant Lendly's advantage, including through inevitable disclosure as a result of Defendant Brichler's employment with Defendant Lendly.

85. Defendant Brichler's conduct constitutes knowing, willful and malicious misappropriation.

86. As a direct and proximate result of Defendant Brichler's wrongful conduct, Plaintiffs have been substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, Defendant Brichler will cause further irreparable injury to

Plaintiffs. Plaintiffs have also suffered direct and consequential damages, and are entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

## COUNT IV
### Tortious interference with Contract

87. Plaintiffs incorporate all preceding paragraphs of the Complaint as if fully set forth herein.

88. The elements of tortious interference with a contract are: (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages. *Ginn v. Stonecreek Dental Care,* 2015-Ohio-1600, 30 N.E. 3d 1034 (Ct. App.).

89. The Non-Compete Agreement constitutes a valid and enforceable contract between Plaintiffs and Defendant Brichler.

90. Prior to hiring Defendant Brichler, Defendant Lendly had full knowledge of the Non-Compete Agreement and that Defendant Brichler was subject to non-competition barring his employment in a similar role at Defendant Lendly, and other restrictive covenants.

91. Defendant Lendly actively targeted, recruited and solicited Defendant Brichler to begin employment with Defendant Lendly as its Chief Technology Officer, with knowledge of his non-compete obligation.

92. Even after receiving explicit notice of the Non-Compete Agreement from Plaintiffs, along with a demand to cease and desist from interfering with the Non-Compete Agreement, Defendant Lendly continued to unlawfully interfere with the Non-Compete Agreement including by employing Defendant Brichler as its Chief Technology Officer beginning in late June 2021.

93. Defendant Lendly further intentionally misrepresented to Plaintiffs the scope of Defendant Brichler's actual job responsibilities and duties at Defendant Lendly and took other actions to avoid detection of their direct interference.

94. Defendant Lendly's intentional and unlawful interference with the Non-Compete Agreement has deprived Plaintiffs of the economic benefit of its contract with Defendant Brichler.

95. At all material times, Defendant Lendly acted knowingly, willfully, intentionally, maliciously and without justification in procuring Defendant Brichler's breach of the Non-Compete agreement.

96. As a direct and proximate result of Defendant Lendly's tortious interference with Defendant Brichler's Non-Compete Agreement, Plaintiffs have suffered direct and consequential damages, and are entitled to recover compensatory damages, attorneys' fees, and other damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs CNG and Axcess pray as follows:

(a)     That the Court award Plaintiffs injunctive relief in the form of specifically enforcing the Non-Compete Agreement to the fullest extent allowed by law, including the 12-month post-employment non-competition covenant set forth therein, and including any necessary tolling for periods of violation;

(b)     If deemed necessary for the enforcement sought barring Defendant Brichler's proposed employment role at Defendant Lendly, that the Non-Compete Agreement be accordingly modified or reformed as is required under the Non-Compete Agreement and in accordance with Ohio law to the fullest extent reasonable and so as to be enforceable under the law;

19

(c)     That Defendant Brichler be enjoined from using, divulging, disclosing, revealing, or communicating Plaintiffs' Confidential Information, as defined in the Non-Compete Agreement;

(d)     That Defendant Brichler be enjoined from actual or threatened misappropriation of trade secrets;

(e)     That Plaintiffs be awarded damages for any loss occasioned by breaches of contract and the misappropriation of trade secrets;

(f)     That Plaintiffs be awarded punitive or exemplary damages for Defendant Brichler's willful and malicious misappropriation of trade secrets;

(g)     That Plaintiffs be awarded attorneys' fees for Defendant' Brichler's willful and malicious misappropriation of trade secrets;

(h)     That Plaintiffs be awarded compensatory damages, punitive damages and attorneys' fees for Defendant Lendly's tortious interference with contract; and

(i)     That Plaintiffs be granted its costs of suit together with reasonable attorneys' fees pursuant to the Non-Compete Agreement and such other and further relief as the Court deems appropriate.

Respectfully submitted,

/s/ Jill S. Kirila
Jill S. Kirila (0068593) (Trial Attorney)
SQUIRE PATTON BOGGS (US) LLP
201 East Fourth Street, Suite 1900
Cincinnati, Ohio 45202
(513) 361-1200
jill.kirila@squirepb.com

(614) 365-2700

(614) 365-2499 (facsimile)
jill.kirila@squirepb.com

Attorneys for Plaintiffs

## VERIFICATION

I am the Chief Information Officer of Plaintiff CNG Holdings, Inc., and I am authorized to make this verification on behalf of Plaintiffs CNG Financial Corporation and Axcess Financial Services, Inc. I have read the foregoing Verified First Amended Complaint, I am familiar with the matters and things alleged therein, and to the best of my knowledge and belief, the facts stated and the allegations contained therein are true.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of November, 2021.

Chris Sibila

**CERTIFICATE OF SERVICE**

On March 8, 2022, this document was filed electronically with the Clerk of the United

States District Court for the Southern District of Ohio, Western Division, which will electronically

serve a copy of the foregoing on counsel of record, including upon the following:

> *Gary L. Greenberg, Esq.*
> *Robert D. Shank, Esq.*
> Jackson Lewis P.C.
> PNC Center
> 26th Floor
> 201 E. Fifth Street
> Cincinnati, OH 45202
> Gary.Greenberg@Jacksonlewis.com
> Robert.Shank@Jacksonlewis.com
>
> *Attorneys for Defendants*

                                    /s/ Jill S. Kirila
                                    One of the Attorneys for Plaintiffs